No. 23-15580

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JACK GESCHEIDT, LAURA CHARITON, AND ANIMAL
LEGAL DEFENSE FUND,

*Plaintiffs-Appellants*,

v.

DEB HAALAND, in her official capacity as Secretary of the
U.S. Department of the Interior; SHAWN BENGE, in his official
capacity as Director of the National Park Service; and
CRAIG KENKEL in his official capacity as Superintendent of the Point
Reyes National Seashore,

*Defendants-Appellees*.

On Appeal from the United States District Court,
Northern District of California, Case No. 4:21-cv-04734-HSG

# BRIEF OF AMICUS CURIAE POINT REYES SEASHORE RANCHERS ASSOCIATION IN SUPPORT OF APPELLEES AND OPPOSING APPELLANTS' OPENING BRIEF

Aaron Bruner
Western Resources Legal Center
9220 SW Barbur Boulevard, Suite 119-327
Portland, Oregon 97219
Tel: (503) 768-8500
abruner@wrlegal.org

*Attorney for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Point Reyes Seashore Ranchers Association does not issue stock or have a parent corporation.

## STATEMENT OF AUTHORSHIP AND REQUEST FOR CONSENT

Pursuant to Fed. R. App. P. 29(a)(4)(E), Amicus Curiae certifies that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund preparing or submitting this brief, and that no person or entity other than Amici Curiae or their counsel authored the brief or made a monetary contribution to the preparation or submission of this brief.

Amicus Curiae sought the consent of the Parties to file this brief. Both Federal Defendants Deb Haaland, et al., and Plaintiffs Jack Gescheidt, et al., consented to this filing. Accordingly, no motion for leave to file an amicus brief was filed.

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................. 1

INTRODUCTION ................................................................................................. 5

BACKGROUND .................................................................................................. 7

    A.    Factual Background ................................................................................ 7

            1.    History of the Point Reyes Ranches and Dairies ................................. 7

            2.    History of Point Reyes National Seashore ......................................... 11

            3.    History and Status of Tule elk in Point Reyes National Seashore ...... 13

    B.    Legal Framework ................................................................................. 15

            1.    1980 General Management Plan ......................................................... 17

            2.    1998 Tule Elk Management Plan ....................................................... 19

            3.    2021 General Management Plan Amendment ..................................... 20

ARGUMENT ...................................................................................................... 21

    A.    Removal of the Tomales Point Fence Contradicts the Enabling Legislation and Management Plans for the Seashore ................................. 21

    B.    Removal of the Tomales Point Fence Would Amount to A De Facto Expansion of the Phillip Burton Wilderness ............................................. 23

    C.    Plaintiffs' Proposal Fails to Address Their Concerns for the Tule Elk ....... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Norton v. S. Utah Wilderness*,
  542 U.S. 55 (2004) ...........................................................................7, 8

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council*,
  435 U.S. 519 (1978) ...........................................................................23

**Statutes**

16 U.S.C. § 159 ...........................................................................13

16 U.S.C. § 459c ...........................................................................9, 11, 12

16 U.S.C. § 459c-5 ...........................................................................13, 22, 24, 26

16 U.S.C. § 673e ...........................................................................14

16 U.S.C. § 673g ...........................................................................14

16 U.S.C. § 1131(a) ...........................................................................12

54 U.S.C. § 100101(a) ...........................................................................16

54 U.S.C. § 100502 ...........................................................................16, 17, 18

**Public Laws**

Pub. L. No. 87-657 (1962) ...........................................................................9, 11, 12

Pub. L. No. 88-577 (1964) ...........................................................................12

Pub. L. No. 94-389 (1976) ...........................................................................14

Pub. L. No. 94-544 (1976) ...........................................................................12

Pub. L. No. 94-567 (1976) ...........................................................................24

Pub. L. No. 95-625 (1978) ........................................................16

Pub. L. No. 95-630 (1978) ........................................................13

Pub. L. No. 99-68 (1985) .........................................................12

**Other Authorities**

64 Fed. Reg. 63,057 (Nov. 18, 1999) .....................................24

H. Rep. 95-1165 .......................................................................13

**STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE**

The Point Reyes Seashore Ranchers Association ("PRSRA") is an association consisting of 14 ranching families[1] that have been stewards of the rangelands at Point Reyes for many generations. PRSRA's members currently hold active leases/permits for ranch properties on the Point Reyes National Seashore and adjacent Golden Gate National Recreation Area ("GGNRA") that may be impacted by this litigation. These ranches, and the surrounding area, were designated as the Point Reyes National Seashore ("Seashore") in 1962, serving as a testament to the many decades of superior ranch management on the Point Reyes peninsula that contributed to the cultural, historic, scenic, and environmental quality of the Seashore. Many of the families' histories in the area date back to the 1800s and they are proud to have partnered with the National Park Service

---

[1] PRSRA members include B Ranch (Linda, Jarrod, and Kayla Mendoza, Jolynn McClelland); C & D Ranches (Ernie, Nichola, and Ernest Spaletta); C. Rogers Ranch (Fred and Virginia Rogers); F Ranch (Tim Gallagher); G Ranch (Joe, Kevin, Nancy, Brigid, Patrick, and Sean Lunny); Gallagher Ranch (Robert Giacomini); Home & N Ranches (Gino, Kathy, and Clayton Lucchesi); L Ranch (Linda Mendoza, Jolynn and Robert McClelland); M Ranch (Rich and Jacqueline Grossi, Joyce Arndt); McFadden Ranch (Mike and Morgan Giammona); McIsaac & Cheda Ranches (Levi, Courtney, and Rhea McIsaac); Percy Ranch (Paulette Percy); R. Giacomini Ranch (Ralph Giacomini, Jr. and Luke Giacomini); Zanardi Ranch (Louis and Wyatt Zanardi). Copies of Point Reyes and North District GGNRA leases/permits are publicly available at the following: NAT'L PARK SERV., *Ranching and Dairying Lease/Permits*, *available at*: https://www.nps.gov/pore/getinvolved/planning-gmp-amendment-leases-permits.htm (last visited Oct. 29, 2023).

("NPS") to create the Seashore in the 1960s. This partnership has been instrumental to providing the opportunity to experience the natural splendor of undeveloped California coastline alongside the historic ranches and dairies practicing traditional animal husbandry and contributing to local food production.

The farmers and ranchers were key to the establishment of the Seashore in the 1960s, with many families choosing to transfer their land to NPS to ensure it would remain protected from development. In return, upon the Seashore's establishment, ranch families received rights from the federal government to remain on and operate their ranches. This was in recognition of the families' long and vital contributions to the historical, cultural, agricultural, and environmental attributes of the working landscapes at the Seashore. Since the creation of the Seashore, the ranchers have honored this relationship by working with the NPS and the public to maintain the historical, cultural, and environmental qualities of the Seashore for the visiting public's enjoyment.

In 1980, NPS adopted a General Management Plan ("1980 GMP")[2] for the Seashore recognizing this relationship:

> Throughout the last half of the 19th century and the first half of the 20th century Point Reyes was well known for its productive dairy

---

[2] *See* NAT'L PARK SERV., GENERAL MANAGEMENT PLAN FOR POINT REYES NATIONAL SEASHORE (1980), *available at*: https://www.nps.gov/pore/learn/management/upload/planning_gmp_1980.pdf (last visited November 2, 2023).

ranches. Although the establishment of the seashore and changes within the dairy industry have resulted in a reduction of agricultural activity at Point Reyes, Congress clearly intended that the ranches continue to operate. A pastoral zone . . . has been established within the park in which dairy and beef cattle are allowed to graze under permit or lease from the National Park Service.

1980 GMP at 7.

Although the 1980 GMP and subsequent NPS management actions have continued to recognize the fundamental role of the historic dairies and ranches on the Seashore, there has been a small but vocal opposition to their continuation.[3] Yet NPS has continued to recognize the historic ranches as an integral part of the Seashore. In 2021, NPS issued a General Management Plan Amendment[4] ("2021 GMPA") particular to ranch and dairy activities, which envisioned the issuance of 20-year leases/permits to ranches and dairies on the Seashore and the adjacent NPS-managed GGNRA. The

_____

[3] In 2016, the PRSRA intervened in a lawsuit against NPS which halted an ongoing environmental review process and threatened the rights of PRSRA families to continue to ranch, live in and earn livelihoods producing dairy and meat in the Seashore. *Resource Renewal Inst. v. Nat'l Park* Serv., Case No. 4:16-cv-00688-SBA (N.D. Cal.). As part of that case, the PRSRA was able to engage in a settlement that ultimately resulted in the issuance of five-year interim leases, enabling ranches and dairies to continue their agricultural operations on the Seashore while the NPS undertook a new planning process.

[4] NAT'L PARK SERV., GENERAL MANAGEMENT PLAN AMENDMENT, *available at*: https://www.nps.gov/pore/getinvolved/planning_gmp_amendment.htm (last visited Nov. 2, 2023). This brief refers to the 2021 GMPA Record of Decision as the 2021 GMPA.

PRSRA is a party to a case challenging the 2021 GMPA. *Res. Renewal Inst.*

*v. Nat'l Park Serv.*, No. 3:22-cv-145-MMC (N.D. Cal.[5]

NPS addressed management of Tule elk in not only the 1980 GMP,

but also the 2021 GMPA, and the 1998 Tule Elk Management Plan ("1998

Elk Plan").[6] The trio of NPS management documents consider the rich

heritage of the Seashore, particularly emphasizing the historical significance

of the ranches. While the reintroduction of the Tule elk to California is an

ecological achievement, their ballooning populations on the Seashore have

become a daily concern for ranch and dairy operations.[7]

---

[5] The case, which also deals with Tule elk management, is currently in mediation/settlement talks, in which the PRSRA and its members continue to participate closely, given the potential for a settlement to directly impact dairies and ranches with permits and leases on the Seashore and in the GGNRA. *See Resource Renewal Inst., et al. v. Nat'l Park Serv.*, ECF Nos. 73, 74, No. 3:22-cv-145-MMC (N.D. Cal).

[6] *See* Tule Elk Management Plan and Environmental Assessment (1998) https://www.nps.gov/pore/getinvolved/upload/planning_tule_elk_mp_ea_1998.pdf (last visited November 2, 2023).

[7] Tule elk tend to linger in the same areas, overgrazing the land and causing erosion, and do not have any natural predators that would naturally mitigate their population growth or deter encroachment onto ranch pasture lands. The Tomales Point fence thus provides one of the few significant obstacles to Tule elk having free run of the adjacent ranch properties. Additional effects of Tule elk on ranch lands includes: elk presence makes cattle nervous which, in turn, leads to lower milk production for dairy cows; elk regularly cause damage to fences and irrigation infrastructure, which the ranches must fix at substantial cost; at times, ranches must purchase or provide supplemental water and feed to remedy these issues; aside from the

The existing management plans provide tools for NPS to manage Tule elk herds on the Seashore and ensure they remain within their designated wilderness areas, thereby preventing their encroachment on pastoral lands. Plaintiffs' preferred outcome of removing the Tomales Point fence would only exacerbate these issues, at the risk of completely inundating the adjacent dairies and ranches with elk. Such a move would not only contradict the established NPS management plans but also jeopardize the livelihoods of the dairy and ranch families who have stewarded these lands for over a hundred years.

## INTRODUCTION

Plaintiffs assert that NPS's delay in updating the 1980 GMP for the Seashore is largely due to their belief that the removal of the Tomales Point fence is essential for the agency to fulfill its Tule elk management duties. Yet, NPS evaluated and declined this proposition, recognizing the severe repercussions such a move would have on prevailing activities, notably the historic ranches and dairies within the Seashore. Although the case may appear to focus on a narrow legal matter, Plaintiffs' desired outcome could jeopardize the long-standing equilibrium of interests at Point Reyes.

---

cost of purchasing additional feed, the use of feed grown off-site can also present issues for dairies maintaining organic certifications.

First, dismantling the Tomales Point fence would jeopardize the operations of dairies and ranches on the Seashore, which function under specific leases, permits, and authorizations. The outcome favored by Plaintiffs sharply contrasts with the Seashore's enabling statutes, NPS's management plans, and would severely disrupt present ranch and dairy operations. NPS has diligently crafted a balanced approach to land management that respects both human endeavors and wildlife conservation on the Seashore; a balance the Court should uphold.

Second, Plaintiffs fail to present a holistic solution for the management of Tule elk at the Seashore, focusing primarily on their wish for a new plan that eliminates the Tomales Point fence. The Seashore's foundational legislation does require NPS to grant Tule elk unrestricted access across all lands, especially if it compromises other Seashore resources. The Seashore was not created exclusively for elk conservation or solely for wildlife protection. It pursues varied objectives, such as recreation and safeguarding the historical essence of ranching and dairying, as outlined in the Seashore's original legislation and subsequent management decisions by NPS. The guidelines set in the 1980 GMP, 2021 GMPA, and the 1998 Elk Plan offer ample guidance for balancing Tule elk management with other activities within the Seashore.

Lastly, should this Court interpret NPS's responsibility to periodically prepare land management plans as a discrete agency action that can be compelled

under *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004), over concerns about a singular wildlife species, it may inadvertently establish a precarious precedent for other land management agencies with similarly expansive planning duties. NPS, in isolation, oversees close to 80 million acres, and in totality, federal entities manage roughly 640 million acres, accounting for 28% of the entire land expanse in the United States. A ruling for Plaintiffs in this context might transform the capacity of federal agencies to judiciously decide the timing, locations, and methodologies for federal land management.

For these reasons, PRSRA contends that the Court should dismiss Plaintiffs' claims and maintain the enduring, legally endorsed equilibrium between sustainable human endeavors and conservation at Point Reyes.

## BACKGROUND

**A. Factual Background**

*1. History of the Point Reyes Ranches and Dairies*

Point Reyes, located on a picturesque peninsula in Marin County, California, boasts a rich history deeply intertwined with agriculture.[8] Dairy ranching families settled and worked in the region since as early as the mid-1800s, making

---

[8] *See* NAT'L PARK SERV., *Ranching History at Point Reyes*, *available at*: https://www.nps.gov/pore/learn/historyculture/stories_ranching.htm (last visited Nov. 2, 2023).

instrumental contributions to what was once heralded as the butter capital of California. Over time, advances in dairy production and distribution technologies elevated Point Reyes as an example of high-quality dairy production, fostering a symbiotic relationship between the dairy industry and the broader community. *Id.* The "Point Reyes brand" of dairy products found ready markets in burgeoning urban areas, such as San Francisco. *Id.*

In the wake of World War II, Marin County experienced a surge in property values. Policies during the 1950s and 60s catered to real estate development, causing property taxes to soar and putting financial strain on dairy operations. Affluent newcomers began to perceive Point Reyes not only as a production hub but also as a scenic recreational asset, causing a divergence in land-use perspectives that put existing ranchers and dairy farmers under further pressure. In response to these challenges and the looming specters of condemnation and eminent domain, legislation in 1962 struck a balance that ensured ranching's continued presence by authorizing the establishment of the Seashore and acquisitions of lands thereon with the consent of ranches and dairies and directing the Secretary not to "unnecessarily interfere" with lands used exclusively for ranching and dairying purposes. *See* Pub. L. 87-657, 76 Stat. 538 (Sep. 13, 1962)

(codified as amended at 16 U.S.C. § 459c, *et seq.*).[9] This legislation led to the acquisition of nearly 71,000 acres by NPS for the creation of the Seashore.

While this legislative action secured the region's pastoral character, it also shifted the dynamics of land ownership, converting private ranches into part of a federally managed seashore. Nonetheless, dairies and ranches have been and continue to be integral to the fabric of Point Reyes, a tradition that has adapted and endured through changing economic, social, and regulatory landscapes.

The enduring significance of dairy ranching in Point Reyes is deeply woven into the fabric of the region. In 1980, acknowledging the profound contributions of the ranching community, NPS embarked on an initiative to restore the ranch core, presenting it as a prime example of 1800s dairy ranching in west Marin. NPS's commitment to preserving this heritage was aptly demonstrated when Pierce Point Ranch earned a place on the National Register of Historic Places in 1985. This historic site was later opened to the public, serving as a testament to the ranchers' enduring legacy.

Bear Valley Ranch was aptly chosen as the central hub for the Seashore's administrative functions. Present-day visitors to the Bear Valley Visitor Center can

_____

[9] Point Reyes National Seashore Enabling Legislation, https://www.nps.gov/pore/learn/management/upload/lawsandpolicies_usc16sec459c_enablingleg.pdf (last visited Nov. 2, 2023).

immerse themselves in the ranch's rich history as they traverse its rejuvenated core, which adeptly merges historical preservation with contemporary park administration needs. Established in 1983, the visitor center is a monument to the region's agricultural roots, seamlessly integrating with its environment and mirroring its historical significance. The inclusion of 17 ranches on Point Reyes in the National Register in 2018 also attests to the unparalleled historical and cultural contributions of the ranching community.

Highlighting the harmony between working ranches and the Seashore, the Secretary of the Interior in 2012 expressed in a memorandum that working ranches are a "vibrant and compatible part" of the Seashore "both now and in the future." 2021 GMPA at 3. A Congressional Explanatory Statement to the Consolidated Appropriations Act of 2019 accentuated the importance of multi-generational ranching, acknowledging its "importance both ecologically and economically" for the Seashore and the surrounding community of Marin County.[10] Presently, over 20

---

[10] H. Rpt. 116-9 at 72021 (2019), a*vailable at*: https://www.govinfo.gov/content/pkg/CRPT-116hrpt9/pdf/CRPT-116hrpt9.pdf (last visited Nov. 2, 2023). Speaking of the GMPA in development at the time, the statement noted: "The Conferees strongly support the inclusion of alternatives that continue ranching and dairying, including the Service's Initial Proposal to allow existing ranch families to continue ranching and dairying operations under agricultural lease/permits with 20-year terms, and expect the Service to make every effort to finalize a General Management Plan Amendment that continues these historic activities." *Id.* at 721.

families possess a range of leases, permits, and authorizations. These agreements, formulated pursuant to a 2017 Settlement Agreement,[11] encourage family continuity by encompassing immediate family members, thereby ensuring the perpetuation of the time-honored ranching legacy in Point Reyes.

2. *History of Point Reyes National Seashore*

In 1962, Congress created the Point Reyes National Seashore and placed it under the administrative authority of the Secretary of the Interior. Pub. L. No. 87-657, 76 Stat. 538 (1962) (codified at 16 U.S.C. §§ 459c *et. seq.*). The Seashore's 1962 enabling legislation recognized a pastoral zone in the Seashore where existing ranches and dairy farms could continue to operate. Pub. L. No. 87-657 § 4, 76 Stat. 538, 540. The park's purpose encapsulates a multi-use approach, aiming to "protect a rugged and wild coastal peninsula and surrounding waters, connecting native ecosystems, enduring human history, and recreational, scientific, and educational opportunities." 16 U.S.C. § 459c.

---

[11] NPS developed the 2021 GMPA pursuant to a multi-party Settlement Agreement reached in *Res. Renewal Inst. v. Nat'l Park Serv.*, 4:16-cv-688 (N.D. Cal.), which also authorized the granting of short-term interim leases under current terms and conditions while the agency developed plans to provide for longer-term, 20-year leases supported by Congress, along with options for agricultural diversification, increased operational flexibility, and succession planning. *See id.*, ECF No. 143; 2021 GMPA at 4. The value of those long-promised leases would be significantly undermined by any decision involving removal of the Tomales Point fence.

Two years later, Congress enacted the Wilderness Act of 1964, which formed the National Wilderness Preservation System. Wilderness Act of 1964, Pub. L. No. 88-577, 78 Stat. 890 (codified at 16 U.S.C. §§ 1131–36). This act explicitly stated that "no Federal lands shall be designated as 'wilderness areas'" to "be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, the preservation of their wilderness character, and for the gathering and dissemination of information regarding their use and enjoyment as wilderness." 16 U.S.C. § 1131(a). In line with this, in 1976, a portion of the Seashore was designated as the Point Reyes Wilderness, later renamed the Phillip Burton Wilderness Area. Pub. L. No. 94-544 (1976); Pub. L. No. 99-68 (1985), 99 Stat. 166.

In 1978, Congress further amended the Seashore's enabling statute to give authority for the Secretary of the Interior to lease federally owned "agricultural land" within the Seashore in perpetuity, defining "agricultural land" as "lands which were in regular use for . . . agricultural, ranching, or dairying purposes as of May 1, 1978." Pub. L. No. 95-630 (1978), § 1701, 92 Stat. 3641, 3714 (codified at 16 U.S.C. § 459c-5). This amendment allows the Secretary to lease federally owned lands that were agricultural before their acquisition, subject to restrictive covenants to fulfill the Act's purposes. The first right of leasing is extended to the

previous landowner or leaseholder. 16 U.S.C. § 159-c5(a). An accompanying report clarified the amendment was designed "to protect the pastoral character" of the lands and that agricultural lease-backs were "encouraged to the fullest extent in ensuring perpetuation of this use." H. Rep. 95-1165 at 71 (1978).

The legislative and regulatory frameworks governing the Seashore reflect a nuanced balance between natural preservation, cultural heritage, historic preservation, and multiple other uses, including ranches and dairies—a testament to the area's complex and rich history. Today, the Seashore comprises multiple land-use designations: approximately 33,000 acres of wilderness, 28,000 acres of ranchlands, and other spaces consisting of marine areas, coastal landscapes, archeological sites, and recreational amenities. 1998 Elk Plan at 4; GMPA at 6.

3. *History and Status of Tule elk in Point Reyes National Seashore*

Nearly a decade after the establishment of the Seashore, in 1976 Congress directed the Secretary to formulate a plan focused on the restoration and conservation of Tule elk. Pub. L. No. 94-389 (1976), 90 Stat. 1189 (codified at 16 U.S.C. § 673g). This plan was to be integrated with corresponding plans from State and local authorities in California. *Id*. The directive extended to the Secretaries of the Interior, Agriculture, and Defense to make lands under their jurisdictions available for the preservation and grazing of Tule elk. 16 U.S.C. § 673e.

The Seashore emerged as a key reintroduction site for the Tule elk in California. In 1978, a herd of ten Tule elk was translocated to Tomales Point, a 2,600-acre peninsula in the northwest of the Seashore. 1998 Elk Plan at 8. To avoid infringing on the operations and pastures of neighboring dairy ranches, an eight-foot fence stretching three miles was erected at the southern base of the peninsula. *Id.* From 1978 onwards, the Tomales Point elk population saw consistent growth, exceeding the target of 140 elk by 1990 and numbering 552 by 1999. *Id.* at 89. NPS ultimately concluded that Tomales Point could sustain a higher elk population than originally anticipated, setting a new range between 350 and 450 animals. *Id.* at 10.

Population data from 1978 to 2017 consistently showed that the elk herd reached its carrying capacity. Fluctuations in annual population numbers were observed, especially during the drought period of 2012–2015. Cal. Dept. Fish & Wildlife, Elk Conservation and Management Plan, at E-370 (2018) ("CDFW (2018)"); 1998 Elk Plan at 16. However, the population has generally rebounded as habitat conditions improved and as of 2017, population surveys indicated over 400 Tule elk at Tomales Point, with another 329 free ranging on the Seashore. CDFW (2018).

Genetic diversity within the Tomales Point herd also warranted attention. Despite limited genetic variation compared to other California herds, there was no

14

observed inbreeding effect. CDFW (2018) at 38. The long-term viability of the herd was not under question, particularly with the Tomales Point fence in place and adequate herd numbers. CDFW (2018) at 36. To manage limited genetic diversity, existing plans recommend genetic monitoring and periodic translocation of Tule elk among herds. CDFW (2018) at 37–38.

The expansion of the Tomales Point elk herd is also just one single facet in the broader narrative of Tule elk restoration efforts in California. From a dangerously low number of fewer than 10 Tule elk in 1870, the state has seen its population swell to 5,700, dispersed among various herds. CDFW (2018) at 25. Within a mere decade of setting a population goal of 2,000 Tule elk, that target was exceeded. *See* CDFW (2018) at 466-67. This conservation achievement is reflected in Point Reyes as well, where the free-ranging Limantour and Drakes Beach herds coexist alongside the Tomales Point herd. Together, they contribute to a continually expanding statewide population that extends into new habitats. CDFW (2018) at 36.

## B. Legal Framework

Congress mandated that the Secretary, through the oversight of the NPS Director, is responsible for both promoting and overseeing the usage of the National Park System. 54 U.S.C. § 100101(a). This must be done to align with the System's core objective: to preserve its natural landscapes, historical resources

including agriculture,[12] and wildlife, while also ensuring that these resources are enjoyed in a manner that does not compromise their integrity for future generations to appreciate. *Id.* And through the National Parks and Recreation Act, Congress required the Park Service to prepare and revise a general management plan for each unit of the National Park System. *See* Pub. L. 95-625, § 604(3). The current statute reads:

> General management plans for the preservation and use of each System unit . . . *shall be prepared and revised in a timely manner* by the Director. On January 1 of each year, the Secretary shall submit to Congress a list indicating the current status of completion or revision of general management plans for each System unit.

54 U.S.C. § 100502 (emphasis added).

Such plans must include (1) "measures for the preservation of the area's resources"; (2) "indications of types and general intensities of development . . . associated with public enjoyment and use of the area"; (3) "identification of and implementation commitments for visitor carrying capacities for all areas of the System unit"; and (4) "indications of potential modifications to the external boundaries of the System unit, and the reasons for the modifications." *Id.*

---

[12] The Point Reyes and Olema Valley Dairies were designated as Historic Districts pursuant to the National Historic Preservation Act in 2018. 2021 GMPA at 15.

Management plans are also the essential document that set the benchmarks for species reintroduction "success," focusing on aspects like carrying capacity, target population sizes, and genetic diversity, all based on the most up-to-date scientific knowledge. CDFW (2018) at 32. Definitions of "carrying capacity" and "population viability" offer frameworks for long-term management of species like the Tule elk. CDFW (2018) at 35; 1998 Elk Plan at 15.

1. *1980 General Management Plan*

In 1980, NPS developed a General Management Plan for the Seashore, outlining a comprehensive strategy for managing various land uses and natural resources. The 1980 GMP delineates the Park Service's objectives, such as safeguarding diverse ecosystems representative of the California seacoast and marine mammals, as well as other threatened and sensitive natural resources within the Seashore. 1980 GMP at 1–2, 12–13. Management of natural resources under the Plan envisioned pursuit of restoration activities such as Tule elk reestablishment efforts, unless such actions compromise other values. *Id*. at 13.

Together with natural resources, the 1980 GMP emphasizes improved grazing and range management practices in cooperation with ranchers. *Id.* at 2. Preservation of structures listed or nominated for the National Register of Historic Places is also a priority, such as on the Pierce Point Ranch. *Id*. at 2–3, 9, 11, 14. The plan foresees the indefinite continuation of ranching activities. *Id*. at 11–12. To

segregate Tule elk from public lands leased to ranchers, a fence was erected. *Id*. at 1998 Elk Plan.

The 1980 GMP uses land management zoning to balance diverse land uses and objectives, describing the zones as a "composite picture" of future park management based on resource values and public expectations. 1980 GMP at 9. Categories range from natural resources management to cultural resource management, visitor activities, and development. *Id*. at 1–3. The 1980 GMP strongly underscores the importance of each objective, applauding the "rich diversity of seashore ecosystems and cultural resources," and the public's strong attraction to the area. *Id*. at iii, 3.

In detailing zones, the 1980 GMP designates four major categories: a natural zone, a special uses zone, a historic zone, and a development zone. *Id*. at 9–11. The natural zone, home to Tule elk, focuses on environmental subzones for wilderness and reserves. *Id*. at 9, 11. The special uses zone permits ongoing ranching and includes other facilities like the Federal Aviation Administration's radio range station. *Id.* at 11. The historic zone incorporates sites of historical and archaeological significance, such as the Point Reyes lighthouse complex and

Olema lime kilns.[13] Lastly, the development zone contains essential visitor and administrative facilities. 1980 GMP at 11.

2. *1998 Tule Elk Management Plan*

The 1998 Elk Plan was crafted two decades after the 1978 reintroduction of Tule elk to the Seashore. It was designed with the understanding that management practices must adapt to dynamic ecological conditions and that interventions would be needed once certain environmental "thresholds" were reached. 1998 Elk Plan at 16, 40, 88. The 1998 Elk Plan aims to guide Tule elk management, monitoring, and research within the Seashore. *Id.* at 39–41.

The 1998 Elk Plan thoroughly evaluated four alternatives as mandated by the National Environmental Policy Act and ultimately chose Alternative A for its multifaceted approach to elk management. *Id.* at 42–43. Alternative A remains the governing framework for Tule elk management today. *Id.* at 46. It continues the fencing at Tomales Point and introduces a free-ranging herd in the Limantour area. *Id.* at 43. It also sets interim population targets, outlines long-term indicators for active management, and escalates monitoring and research efforts. *Id.* at 42–43.

The 1998 Elk Plan underscores the importance of maintaining the elk fence at Tomales Point. It rightly identifies that removing the fence and limiting ranching

---

[13] Nat'l Park Serv., *Point Reyes National Seashore* (Aug. 8, 2017), https://www.nps.gov/articles/pointreyes.htm (last visited Nov. 2, 2023).

activities would not only create legal conflicts but would also threaten continued ranching. *Id*. at 14–15, 49, 52.

3. *2021 General Management Plan Amendment*

The 2021 GMPA serves as an update to the 1980 GMP for 28,000 acres of lands within the Seashore and the neighboring Golden Gate National Recreation Area that are under agricultural lease or permit, including Tule elk management within these territories. 2021 GMPA. This amendment underscores the principle of multi-use zoning and crafts an approach to protect both the rich natural environment and the cherished cultural heritage. Moreover, the 2021 GMPA stresses the significance of fostering interpretive, scientific, and educational endeavors within the Seashore. *Id*. at 4.

Following the 2017 Settlement Agreement, NPS resolved to prioritize the management of ranchlands leased within the Seashore. Emphasized within the pages of the 2021 GMPA is a robust endorsement for the perpetuation of multi-generational ranching, coupled with an evolution towards contemporary management methodologies. *Id*. at 46–49. While the 2021 Amendment does not directly comment on the Tomales Point elk fence due to its geographic scope, it addresses Tule elk management on the ranchlands and categorically opposes initiatives aiming to curtail or abolish grazing activities. *Id*. at 5.

NPS closely examined six potential alternatives, ultimately selecting Alternative B, seeking to harmonize the preservation of both natural treasures and the historical agricultural legacy on the Seashore. *Id*. at 46. To ensure ranchers have the confidence to pursue vital long-term advancements, the GMPA provides for extended leases spanning up to 20 years. *Id*. at 18. Additionally, the Amendment delineates strategies to oversee the roaming elk populations within the designated planning area. *Id*. at 34–35.

In short, the 2021 GMPA envisions a continued symbiotic relationship between varied stakeholders, resources, and uses in order to maintain the Seashore's invaluable natural, historic, and cultural resources.

## ARGUMENT

### A. Removal of the Tomales Point Fence Contradicts the Enabling Legislation and Management Plans for the Seashore

The governance of Seashore is neither arbitrary nor haphazard; it is the outcome of a well-considered array of enabling legislation, wilderness designations, lease agreements, and management plans. Together, these frameworks harmonize the interests of natural conservation and sustainable human activities. Dairies and ranches are deeply entwined in the heritage and economy of the area—as recognized and accommodated within these frameworks. Congress's intent in creating the Seashore was clear: to achieve an enduring balance that respects both the natural world and human livelihoods.

Removal of the Tomales Point fence would be a radical change to the existing equilibrium at the Seashore that fundamentally undermines the policy objectives laid out in the Seashore's enabling legislation, including the importance of dairy ranching in sustaining the area's unique ecosystem and cultural landscape. Plaintiffs' preferred outcome also contravenes guidelines explicitly established in the 1980 GMP and the 1998 Elk Plan. The enabling legislation of the Seashore specifically envisioned that historical ranching and dairy farming would continue. *See* 16 U.S.C. § 459c-5(a), (b) (providing for leases of lands historically used for agriculture, ranching, or dairying purposes).

The 1980 GMP and the 2021 GMPA are not merely a set of recommendations; they are a binding roadmap that delineates specific zones and uses. 1980 GMP at 9–12; *see* 2021 GMPA at 35–37 ("The establishment of new elk herds on areas leased for ranching will be discouraged," including hazing, lethal removal, and managing to keep the established Drake's Beach and Limantour herds within their core areas.). The proposed dismantling of the Tomales Point fence would undermine these zoning distinctions, resulting in massive expansion of Tule elk into areas designated for ranching. *See* 1998 Elk Plan at 51–52. Such an incursion would represent a profound degradation of the zoning protections enshrined in the 1980 GMP and 2021 GMPA, placing at risk the economic and

ecological stability of a ranching community that has coexisted with natural ecosystems for generations.

Management plans are not created in a vacuum; they result from robust scientific research, public comment, and legal rigor. The existing plans for the Seashore have managed to balance a complex tapestry of needs, including those of the ranching and wildlife communities. A history of statutory and decisional law cautions "reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council*, 435 U.S. 519, 525 (1978). Any order from this Court implicating removal of the Tomales Point fence would infringe upon this principle and may initiate a chain reaction of unintended, yet devastating, consequences. The fallout could extend from a decline in ranching activities and an imbalance in local ecosystems to far-reaching socio-economic repercussions for the community.

Therefore, it is imperative that the Court deny Plaintiffs' request for relief and upholding the integrity of existing legislation and management direction.

**B. Removal of the Tomales Point Fence Would Amount to A De Facto Expansion of the Phillip Burton Wilderness**

In advocating for the removal of the Tomales Point fence and the cessation of ranching activities, Plaintiffs misunderstand the core legislative mandates that shape the Seashore. The authority to designate wilderness areas is a prerogative

solely vested in the United States Congress under the Wilderness Act of 1964. 16 U.S.C. § 1131–1136. In 1976, Congress designated over 25,000 acres within Seashore as a wilderness area, which was later expanded to 27,122 acres. Pub. L. 94-567, § (k), 90 Stat. 2692 (1976); 64 Fed. Reg. 63,057 (Nov. 18, 1999) (areas listed as potential wilderness may eventually raise that number to 33,373 acres).

An order from this Court crediting Plaintiffs' concerns over Tule elk or directing NPS to consider removal of the Tomales Point fence would be inappropriate and in direct contravention of the Wilderness Act, which reserves the power to designate Wilderness Areas solely to Congress. The text and context of the Seashore's enabling statutes along with Congress's wilderness designation establish that Congress envisioned dairies and ranches as an essential element of the mixed-use strategy for the area to be implemented by the NPS, leading to the 1980 GMP, 1998 Elk Plan, and the 2021 GMPA. *See* 16 U.S.C. § 459c–5 (contemplating continuing reservation of use for ranches and dairies from whom the lands were acquired by the Park Service).

These planning documents were crafted by the Park Service to balance these various uses and in light of the already significant wilderness areas on Tomales Point available for Tule elk. To remove the Tomales Point fence would be to effectively dismantle ranching activities on the Seashore—allowing Tule elk to expand freely outside the designated wilderness area and into the pastoral lands.

Not only would this amount to a *de facto* expansion of wilderness in absence of a Congressional designation, but it would undermine the carefully weighed balance between natural conservation and human activities envisioned by Congress in Point Reyes enabling legislation and fleshed out in the 1980 GMP, 1998 Elk Plan, and the 2021 GMPA.

Plaintiffs seek more than just a shift in policy concerning Tule elk, but rather a seismic legal upheaval that contravenes established federal law and disregards multi-stakeholder consensus. Such a course is legally untenable and would severely compromise the integrated, multiple-use strategy that has been meticulously constructed to govern the Seashore.

### C. Plaintiffs' Proposal Fails to Address Their Concerns for the Tule Elk

Plaintiffs' desired outcome of removing the Tomales Point fence may sound straightforward, but significantly oversimplifies the intricate web of legal, ecological, and stakeholder concerns that define land management at the Seashore. Yet it also makes little to no sense as a strategy to improve Tule elk conservation.

The 1998 Elk Plan conducted a detailed assessment of the implications arising from the proposed removal of the Tomales Point fence, as advocated by Plaintiffs. The plan identified potential ramifications of removing the Tomales Point fence, encompassing concerns for threatened and endangered species, the preservation of archeological sites, and ensuring public safety. 1998 Elk Plan at

66–67. A scenario without the fence could precipitate unwarranted encounters between the Tule elk, other indigenous species, the region's historical fabric, and the visiting public. *Id*. Furthermore, the 1998 Elk Plan recognizes the concerns of adjacent landowners that fence removal may catalyze an unsustainable Tule elk population surge within the Seashore, thereby extending threats to adjacent territories. *Id*. at 61. The 1998 Elk Plan emphasizes science-based management practices including establishing "thresholds" for intervention and utilizing tools like relocation, immunocontraception, or lethal removal for mitigating adverse impacts. *Id*. at 43, 51.

Removal of the Tomales Point fence also makes little sense from a population perspective. As discussed above, CDFW estimates the Tule elk population statewide to be 5,700 animals, well north of the initial target of 2,000 animals set by Congress in the 1970s as part of the species' reintroduction efforts. Nevertheless, natural population fluctuation based on ecological carrying capacities of their habitats is a phenomenon common to self-regulating species. To propose radical changes to land management—such as removing fences or ceasing ranching activities—based on these natural fluctuations is to fundamentally misunderstand the ecological dynamics at play.

Forty years of data confirm that population counts have been largely consistent with ecological expectations, fluctuating based on available resources.

CDFW (2018) at E-370; 1998 Elk Plan at 16. Thus, the Tule elk reintroduction at Tomales Point has highlighted that the Tomales Point herd can adapt and thrive under varying environmental conditions, solidifying its role in the broader conservation efforts for the Tule elk species.

In this context, removal of the Tomales Point fence would disregard the complex realities of ecological balance, existing human activities, and long-standing legislative intent. Addressing the concerns related to the Tule elk population at the Seashore is already possible within the existing statutory and planning frameworks. Therefore, Plaintiffs' short-sighted concerns about population fluctuations should be dismissed.

## CONCLUSION

Plaintiffs' desire to establish a sanctuary for Tule elk on the Point Reyes peninsula directly contravenes existing legal and ecological frameworks established by the Seashore's enabling legislation and management direction. It also threatens profound cultural and economic consequences of a potential decision allowing Tule elk to overrun the adjacent historic ranches and dairies on the Seashore.

Given these concerns, and the additional possibility of establishing precarious legal precedent that would erode the capacity of federal land

management agencies to balance diverse resources and uses of our nation's public lands, we respectfully urge the Court to find for the Park Service here.

Respectfully submitted,

Dated: November 3, 2023

/s/ Aaron Bruner
Aaron Bruner
Western Resources Legal Center
9220 SW Barbur Boulevard, Suite 119-327
Portland, Oregon 97219
Tel: (503) 768-8500
abruner@wrlegal.org

*Attorney for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this petition contains 6,871 words, excluding the items exempted by Fed. R. App. P. 32(f), in compliance with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

Date:  November 3, 2023

Aaron Bruner
/s/ Aaron Bruner

*Attorney for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Date:  November 3, 2023

/s/ Aaron Bruner
Aaron Bruner

*Attorney for Amicus Curiae*